FILED '03 JAN 23 15:50 USDC-ORE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

OREGON NATURAL RESOURCES COUNCIL,    )
an Oregon non-profit corporation,    )
WATERWATCH OF OREGON, INC., an       )
Oregon non-profit corporation,       )
GOLDEN GATE AUDUBON SOCIETY, a       )    Civ. No. 01-6250-AA
California non-profit corporation,   )
and NORTHCOAST ENVIRONMENTAL         )
CENTER, a California non-profit      )
corporation,                         )    OPINION AND ORDER
                                     )
          Plaintiffs,                )
                                     )
     v.                              )
                                     )
JOHN W. KEYS III, in his official    )
capacity as Commissioner of the      )
Bureau of Reclamation, J. ERIC       )
GLOVER, in his official capacity     )
as Acting Area Manager of the        )
Bureau of Reclamation, and the       )
UNITED STATES,                       )
                                     )
          Defendants.                )
_____)

William C. Carpenter, Jr.
474 Willamette St., Suite 303
Eugene, OR 97401
     Attorney for plaintiffs

Michael W. Mosman
United States Attorney
District of Oregon
James L. Sutherland
Asst. United States Attorney
701 High St.
Eugene, OR  97401

Thomas Sansonetti, Assistant Attorney General
Environment & Natural Resources Division
Jean E. Williams, Section Chief
Samuel D. Rauch III, Assistant Section Chief
S. Jay Govindan

1    - OPINION AND ORDER

Susan M. Henderson
U.S. Department of Justice
Wildlife & Marine Resources Section
Benjamin Franklin Station
P.O. Box 7369
Washington, D.C. 20044-7369
         Attorneys for defendant

AIKEN, Judge:

     Plaintiffs seek an order of costs and attorneys fees in the amount
of $53,595.69 pursuant to the fee-shifting provision of the Endangered
Species Act ("ESA"), 16 U.S.C. § 1540(g)(4).    Plaintiffs' motion is
denied.

                              BACKGROUND

     The parties are familiar with the background of this case, as is
the court.    Thus, the court provides only a brief summary of the
relevant facts preceding this motion.

     On April 9, 2001, a group of plaintiffs comprised of individual
farmers and irrigation districts brought suit against the United States
Bureau of Reclamation ("Reclamation") challenging the decision to
withhold irrigation water from the majority of land within the Klamath
Reclamation Project ("the Project").    See Kandra v. United States Bureau
of Reclamation, 145 F. Supp. 2d 1192 (D. Or. 2001).    Water for the
Project is stored primarily in Upper Klamath Lake ("UKL") on the Klamath
River.    Under the Klamath Reclamation Project 2001 Annual Operations
Plan ("2001 Plan" or "Plan"), certain water elevations of Upper Klamath
Lake were required to support endangered sucker fish and threatened coho
salmon.    Due to inadequate water supplies, the Plan stated that no
irrigation water deliveries would be made to Project water users.

     In addition to water users, two national wildlife refuges - the
Lower Klamath and Tule Lake National Wildlife Refuges - depend on the
Project for water and receive large quantities of return irrigation

2    - OPINION AND ORDER

flows and other Project waters.  Large numbers of bald eagles migrate into the Klamath Basin during fall and winter.  The eagles, listed as "threatened" under the ESA, rely heavily on the abundant waterfowl that use the Lower Klamath National Wildlife Refuge ("LKNWR").

On January 22, 2001, Reclamation forwarded a biological assessment of the Project's effects on the coho salmon to the National Marine Fisheries Service ("NMFS") and requested the initiation of formal consultation under the ESA.  On February 13, 2001, Reclamation forwarded a biological assessment of the Project's effects on the shortnose and Lost River suckers to the United States Fish and Wildlife Service ("FWS") and requested formal consultation.  Reclamation's biological assessments concluded that the Project's continuing operations were likely to adversely affect the sucker species and the coho salmon.

FWS began formal consultation and issued a draft Biological Opinion ("BiOp") on March 13, 2001.  The draft BiOp concluded that Project operations would cause jeopardy to the sucker populations in the UKL. In accordance with the ESA and governing regulations, FWS proposed "reasonable and prudent alternatives" ("RPAs") to the proposed operation of the Project that would not cause jeopardy.  16 U.S.C. § 1536(b)(3)(A).  Similarly, NMFS completed a draft BiOp on March 19, 2001, which concluded that the Project's operations would jeopardize coho salmon and proposed RPAs of minimum water flows.  Upon review of the draft BiOps, Reclamation informed FWS and NMFS that the forecasted water supplies for 2001 were not adequate to meet the needs of both RPAs.  On April 6, 2001, FWS and NMFS released their final BiOps on the effects of the Project on the sucker species, bald eagles, and coho salmon.  FWS and NMFS again concluded that operation of the Project would jeopardize the continued existence of the suckers and the coho

3    - OPINION AND ORDER

salmon.

However, the FWS BiOp concluded that the Project's operations would cause harm, but not jeopardy, to the continued existence of bald eagles, in that some "take" of the species would occur. 16 U.S.C. § 1538(a)(1) (prohibiting all persons from "taking" endangered species). Accordingly, FWS issued an Incidental Take Statement which specified the "impact of such incidental taking on the species," along with any "reasonable and prudent measures" ("RPMs") that FWS considered necessary or appropriate to minimize the incidental take of the species, and the terms and conditions that Reclamation must comply with to implement the RPMs. See 16 U.S.C. § 1536(b)(4).

The ITS estimated that up to 950 bald eagles could be incidentally taken per year, through reduced access to waterfowl, as a result of Project operations when water deliveries to the LKNWR were below 32,255 acre feet ("a.f."). The RPMs contained in the ITS instructed Reclamation to "continue to provide water to the LKNWR for use for waterfowl production to support wintering populations of eagles, when water is available in excess of that required for ESA needs in Upper Klamath Lake, Tule Lake and the Klamath River." See Defendants' Memorandum in Response to Plaintiff's Motion for Costs, pp. 6-7. The ITS provided that the amount of water delivered to the LKNWR, when combined with additional water sources, should equal a minimum of 32,255 a.f. Id. If Reclamation complied with the terms and conditions of the ITS, any harm to the eagles would not be considered a taking under the ESA. 16 U.S.C. § 1536(o).

Based on streamflow forecasts, Reclamation defined the 2001 water year as "critical dry," after determining that inflow volume into UKL would be 108,000 a.f. during the period of April through September, the

4    - OPINION AND ORDER

smallest amount of inflow on record.   On April 6, 2001, Reclamation
issued its 2001 Operations Plan, which incorporates the conclusions
contained in the BiOps and implements the RPAs proposed by FWS and NMFS
to avoid jeopardy to the suckers and coho salmon.   After implementation
of the RPAs, the availability of irrigation water was severely limited.
Accordingly, the 2001 Plan did not provide for the delivery of water to
most Project lands or the wildlife refuges.   However, the Plan made
available for irrigation 70,000 a.f. of water from Clear Lake and Gerber
Reservoirs.   On April 11, the _Kandra_ plaintiffs moved for a preliminary
injunction against the United States Department of Interior to enjoin
Reclamation from implementing the 2001 Plan.

Beginning on April 23, 2001, all parties to the _Kandra_ litigation
participated for three full days in mediation proceedings directed by
Magistrate Judge Thomas Coffin.   Despite intense efforts by Judge Coffin
and the parties, no resolution for the 2001 water year was reached,
although the parties expressed an interest in continued long-term
mediation efforts with Judge Coffin.   On April 30, 2001, this court
issued an opinion and order denying the _Kandra_ plaintiffs' motion for
preliminary injunction.

Comprehensive and intensive mediation continued after issuance of
the court's order through the summer of 2001.   The court ordered all
parties to the _Kandra_ litigation, including three named plaintiffs in
this action, to participate in mediation under the supervision of Judge
Coffin.   Additionally, a number of non-parties participated in the
mediation in an attempt to resolve short-term water needs and achieve
long-term resolutions for the many and conflicting water demands.

In July 2001, Reclamation learned that the level of UKL was
approximately one foot higher than the level previously forecast.   One

5    - OPINION AND ORDER

foot of water in UKL equals approximately 75,000 a.f.  On July 24, 2001, Department of Interior Secretary Gale Norton announced that the "excess" 70,000 to 75,000 a.f. of water from UKL would be delivered to Project water users.  The Secretary's announcement stated that none of the water would be delivered to the wildlife refuges.  However, the Secretary indicated that "[i]n the months ahead we'll be looking at a number of options to assist the over-wintering bald eagles.  These may include seeking new sources of groundwater, purchasing water from willing sellers and developing plans for supplemental feeding."  Declaration of William C. Carpenter, Ex. B.  Although the details remain unclear, the parties essentially agree that some water was delivered to the LKNWR before this lawsuit was filed.

On August 7, 2002, plaintiffs filed suit seeking declaratory and injunctive relief.  Plaintiffs sought declarations that the April 2001 release of water from Clear Lake and Gerber Reservoirs and the July 2001 release of water from the UKL to Project water users did not comply with the requirements contained in the ITS and therefore constituted a "taking" of threatened bald eagles through depletion of the eagle's food source.  Plaintiffs also sought an injunction prohibiting defendants from releasing water from UKL, Clear Lake, or the Lost River until the amount of water identified in the ITS was delivered to the LKNWR.

Mediation efforts in <u>Kandra</u> and this case continued after the filing of plaintiffs' Complaint.  Ultimately, water was secured for the LKNWR for the months of August and September from PacifiCorp (the operator of the Link River Dam at the mouth of the UKL), irrigation districts, and individual water users.  On March 1, 2002, plaintiffs voluntarily dismissed their lawsuit.  Plaintiffs now seek an award of costs and attorneys fees incurred in litigating this action.

6    - OPINION AND ORDER

DISCUSSION

Plaintiffs seek an award of costs and attorney fees under the fee-shifting provision of the ESA, which allows a court to award costs and fees to "any party, whenever the court determines such award is appropriate." 16 U.S.C. § 1540(g)(4).

In <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680 (1983), the Supreme Court examined a similar fee-shifting provision of the Clean Air Act. Section 307 of the Clean Air Act grants courts discretion to "award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such as award is appropriate." 42 U.S.C. § 7607(f); <u>id.</u> at 682-83. The respondents - The Sierra Club and the Environmental Defense Fund - filed petitions for review challenging sulfur dioxide emissions standards. Although the District of Columbia Court of Appeals rejected their arguments and denied relief, it nevertheless awarded attorney fees to respondents "for their contributions to the goals of the Clean Air Act." <u>Id.</u> at 682.

The Supreme Court reversed, holding that "the term 'appropriate' modifies but does not completely reject the traditional rule that a fee claimant must 'prevail' before it may recover attorney's fees." <u>Id.</u> at 686. Rather, "[s]ection 307(f) was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing parties* -- parties achieving *some success*, even if not major success." <u>Id.</u> at 688. Thus, "absent some degree of success on the merits by the claimant, it is not 'appropriate' for a federal court to award attorney's fees under § 307(f)." <u>Id.</u>[1]

---

[1] The Court explicitly stated that its interpretation of the term "appropriate" as set forth in the Clean Air Act applied to similar provisions in other environmental statutes, including the ESA. <u>Id.</u> at 682 n.1.

7    - OPINION AND ORDER

In cases where no formal judgment is entered, courts have allowed fee awards under the so-called catalyst theory. Under this theory, a plaintiff must show that its lawsuit was a "'material factor' or played a 'catalytic role' in bringing about the desired outcome." Wilderness Society v. Babbitt, 5 F.3d 383, 386 (9th Cir. 1993). The court must "then determine whether 'the benefit achieved was required by law and was not a gratuitous act of the defendant.'" Id. (citing Greater Los Angeles Council on Deafness v. Community Television, 813 F.2d 217, 220 (9th Cir. 1987)). Here, plaintiffs seek an award of fees under the catalyst theory.

Defendants respond that the Supreme Court's ruling in Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598 (2001), renounced the use of the catalyst theory to support fee awards in all cases where no formal judgment or consent decree is entered. In Buckhannon, the Court ruled that the catalyst theory cannot support an award of attorney's fees under statutes which authorize fee awards to the "prevailing party." Specifically, the Court held that the term "prevailing party" does not include "a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." Id. at 600.

Both parties present extensive argument as to why the Court's holding in Buckhannon should or should not preclude an award of costs and fees in this action. Upon review of the parties' arguments and the cases cited therein, the simple fact remains that the Court based its ruling in Buckhannon on the meaning of "prevailing party." Given the Court's reliance on this term, I am not convinced that the Court

8    - OPINION AND ORDER

intended to sound a "definitive death knell[]" for the catalyst theory under fee-shifting provisions which do not contain a prevailing party requirement. <u>Union of Needletrades, Indus. and Textile Employees, AFL-CIO v. Immigration and Naturalization Serv.</u>, 202 F. Supp. 2d 265, 287 (S.D.N.Y. 2002); <u>see</u> <u>Loggerhead Turtle v. County Council of Volusia County</u>, 307 F.3d 1318, 1325-26 (11th Cir. 2002) (rejecting argument that <u>Buckhannon</u> precludes catalyst theory under fee-shifting provision of ESA). Rather, I find that <u>Ruckelshaus</u> - which explicitly imposed a lesser standard where the applicable statute allows an award of fees to "any" party whenever deemed "appropriate" - remains the controlling precedent in this case.

While <u>Ruckelshaus</u> imposed a partial prevailing party standard to obtain fees under the Clean Air Act, the Court did not require a formal court judgment or consent decree. I reject any suggestion that <u>Buckhannon</u> altered the standard imposed in <u>Ruckelshaus</u> to require a "partial" judgment or consent decree or other formal relief on some claims before fees may be awarded under the ESA fee-shifting provision. Such a standard would duplicate the prevailing party standard rather than modify it, contrary to the holding in <u>Ruckelshaus</u> that fee-shifting provisions like that in the Clean Air Act "expand the class of parties eligible for fee awards." <u>Ruckelshaus</u>, 483 U.S. at 686, 688; <u>see</u> <u>Buckhannon</u>, 532 U.S. at 603-04 (describing "prevailing party" as one who has prevailed on the merits of <u>some</u> claims or obtained <u>some</u> relief from the court). Although the Ninth Circuit has declared that "the Supreme Court repudiated the catalyst theory," that assertion was made in the context of the Equal Access to Justice Act, which includes a prevailing party requirement. See <u>Perez-Arellano v. Smith</u>, 279 F.3d 791, 792 (9th

9    - OPINION AND ORDER

Cir. 2002). Absent clear precedent holding that the catalyst theory is unavailable to support an award of fees to "any party, whenever the court determines such award is appropriate," I find that an award of fees in this case is not precluded under Buckhannon.

Nevertheless, the court does not find an award of fees appropriate in this case. Comprehensive settlement discussions in Kandra were ongoing when plaintiffs filed the Complaint in this case. The purpose of the mediation was to address the long-term water demands of the Klamath River Basin, including the need for refuge water. The mediation involved a diverse group of parties, including three named plaintiffs in this action, the federal defendants, irrigation districts, individual farmers, PacifiCorp (the operator of the Iron Gate Dam), and representatives from the states of Oregon and California. As plaintiffs concede, some water for the LKNWR was secured prior to the filing of plaintiffs' lawsuit. Ultimately, LKNWR received water obtained from PacifiCorp, irrigation districts, and individual water users who participated in the mediation. Throughout the process, defendants filed several unopposed motions for extensions of time in which to file an Answer, and defendants did not file an Answer or submit an Administrative Record before plaintiffs voluntarily dismissed their Complaint in 2002.

Based on the complexity of events and the fact that mediation efforts were already ongoing, I find it difficult - if not impossible -

---

[2]Defendants also rely on a Ninth Circuit case which reasoned that the Supreme Court in Ruckelshaus read a "prevailing party" requirement into the ESA. See Marbled Murrelet v. Babbitt, 182 F.3d 1091, 1095 (9th Cir. 1999). However, Marbled Murrelet was decided prior to the Court's decision in Buckhannon which clarified and narrowed the definition of "prevailing party." Therefore, I do not find it dispositive.

10   - OPINION AND ORDER

1  to determine a causal link between plaintiffs' Complaint and the

2  attainment of water for the LKNWR. Indeed, the continuing mediation

3  efforts in <u>Kandra</u> included discussions about obtaining water for the

4  LKNWR from a variety of sources. Secretary Norton's announcement on

5  July 24, 2001, indicated that the defendants were attempting to find

6  other sources of water for the LKNWR. Plaintiffs' counsels' opinion

7  that defendants were not pursuing efforts to obtain water before the

8  Complaint was filed is contradicted by defendants. Given the enormity

9  of the situation and the overwhelming and conflicting demands for water,

10 I do not find the government's reluctance to "guarantee" refuge water by

11 a specified date as evidence that it did not intend to provide any water

12 to the LKNWR.

13     Plaintiffs also rely on statements made in an interview by Phil

14 Norton, the LKNWR Manager. Norton expresses dissatisfaction with the

15 priority given the LKNWR by government officials and asserts that

16 defendants do not address water shortages unless a lawsuit is filed.

17 Given the extent of litigation involving the Klamath River Basin, I do

18 not find Norton's statements - presuming they are properly before the

19 court - to be definitive or helpful to the question at issue.

20     The most persuasive evidence of the defendants' alleged reluctance

21 to provide water to the LKNWR is the July 24 release of water from the

22 UKL to Project water users. Although Reclamation released the water to

23 irrigation districts when the RPMs identified in the ITS arguably

24 instructed Reclamation to divert such water to the wildlife refuges[3], I

25

26     [3]Defendants maintain that this action should not be considered,
   because the court lacked jurisdiction over plaintiffs' claim which
27 relied on the July 2001 release of water. However, even if the court
   lacked jurisdiction over this claim, it is considered to the extent
28 that it shows the catalytic effect of plaintiffs' remaining claim
   alleged in the Complaint.

11    - OPINION AND ORDER

1    cannot ignore the fact that mediation efforts to secure other sources of
2    refuge water were ongoing and continued through the following month,
3    just as the Secretary had indicated in her July 24 announcement. Again,
4    plaintiffs concede that some refuge water was secured prior to the
5    filing of their lawsuit.[4]

6    Furthermore, to prevail under the catalyst theory plaintiffs must
7    show a causal link between its lawsuit and the government's action;
8    here, the water was provided to the LKNWR by PacifiCorp and other third
9    parties who are not named as defendants in this action. Thus, I find
10   that the desired result achieved by plaintiffs - water for the LKNWR -
11   cannot be characterized simply as the government's response to
12   plaintiff's Complaint when the result required effort and cooperation
13   from a number of affected participants.

14   Even if plaintiffs' Complaint caused the government to intensify
15   their efforts to secure additional sources of water, plaintiffs must
16   show that the government's actions were required by law. Plaintiffs'
17   Complaint alleged that the April 2001 release of water from Clear Lake
18   and Gerber Reservoirs and the July 2001 release of water from the UKL to
19   irrigation districts did not comply with the requirements of ITS or the
20   RPMs, in that any excess water should have been provided to the LKNWR.
21   Therefore, plaintiffs claimed that the diversion of water from the LKNWR
22   constituted "takings" of threatened bald eagles through depletion of the
23   eagle's food source. See generally, Complaint, ¶¶ 38-60. Defendants

24

25   [4]Plaintiffs also filed a motion to compel discovery and a motion
26   for evidentiary hearing. Plaintiffs wish to take the deposition of
     Phil Norton and possibly others and present such evidence in order to
27   establish a causal link. After reviewing the parties' submissions, I
     find that further discovery and hearing would only add to the costs of
28   this litigation and would not aid the court in its determination.
     Therefore, these motions are denied.

12    - OPINION AND ORDER

respond that plaintiffs must establish that an actual taking of eagles occurred or would have occurred absent the government's action. See Arizona Cattle Growers Assoc. v. United States Fish and Wildlife Serv., 273 F.3d 1229, 1240 (9th Cir. 2001). Plaintiffs concede that no taking of eagles occurred, and the court cannot begin to determine whether a taking would have occurred based on the limited record before it. No motion for preliminary injunctive relief was filed or ruled upon, and defendants did not file an Answer before plaintiffs voluntarily dismissed this action.⁶

Although plaintiffs place great emphasis on the fact that water for the LKNWR was obtained shortly after they filed their Complaint and under threat of a motion for TRO, the circumstances as a whole could just an easily support an inference that the government wished to avoid the expense and effort of further litigation while involved in the mediation process. For all of these reasons, I cannot find that plaintiffs' lawsuit was the catalyst in securing water for the LKNWR.

Finally, the court considers the interconnection between the Kandra mediation and this case, the number of parties involved, the complexity and difficulty of the negotiations as a whole, and the fact that water for the LKNWR was secured within weeks of plaintiff's Complaint. Under these unique circumstances, I do not find an award of costs or fees to be appropriate in this case.

///

///

---

⁶I recognize that plaintiffs prepared a Temporary Restraining Order ("TRO") seeking an injunction requiring defendants to provide water to the refuges, alleging that the withholding of water would constitute an unlawful taking of bald eagles under the ESA. However, the motion was never filed due to the parties' settlement efforts.

13   - OPINION AND ORDER

<u>CONCLUSION</u>

Plaintiff's Motion for Costs of Litigation (doc. 37), Motion for Further Discovery (doc. 57), and Motion for Evidentiary Hearing (doc. 61) are DENIED.

IT IS SO ORDERED.

Dated this $\underline{23}$ day of January, 2003.

_____
Ann Aiken
United States District Judge

14    - OPINION AND ORDER